IN THE SUPREME COURT OF NORTH CAROLINA

No. 333PA23

Filed 13 December 2024

IN THE MATTER OF: L.L.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a per curiam, unpublished decision of the Court of Appeals, *In re L.L.*, No. COA22-1045 (N.C. Ct. App. Nov. 21, 2023), vacating and remanding a permanency-planning order entered by Judge James W. Bateman III in District Court, Onslow County. Heard in the Supreme Court on 31 October 2024.

> *Fox Rothschild LLP, by Nathan W. Wilson, Matthew Nis Leerberg, and Margaret McCall Reece, for petitioner-appellants Daniel and Jessica Hall.*
>
> *Matthew D. Wunsche, for petitioner-appellant Guardian ad Litem.*
>
> *Mercedes O. Chut for respondent-appellee mother.*
>
> *No brief for Onslow County Department of Social Services.*

BARRINGER, Justice.

Petitioners Daniel and Jessica Hall appeal from the Court of Appeals unpublished, per curiam opinion, which reversed and remanded the trial court's permanency-planning and custody order that awarded full custody of Liam[1] to

---

[1] A pseudonym is used to protect the juvenile's identity and for ease of reading. *See* N.C. R. App. P. 42(b).

petitioners and converted the case to a Chapter 50 civil custody proceeding. The question before this Court is whether the findings contained in that trial court order are sufficient to satisfy the relevant statutory provisions. We conclude those findings are sufficient. Accordingly, we reverse the decision of the Court of Appeals.

## I. Background

### A. Factual Background

The beginning of Liam's life was marked by tragedy. When Liam was barely one month old, his parents took him to the Naval Hospital in Onslow County because he appeared to have trouble breathing. Liam arrived with numerous bruises to his head and face, a fracture to his right arm, nine broken ribs, and a skull fracture. When medical staff examined Liam more closely, they further discovered that he had a chest abrasion and a skin laceration to his penis. Due to the severity of Liam's injuries, he was intubated, sedated, placed on a mechanical ventilator, and then airlifted to UNC Hospital. Liam weighed less than he did at birth.

While receiving treatment at UNC Hospital, Liam experienced multiple seizures over his first two days there and remained on a ventilator for nearly a week. Subsequent diagnostic tests revealed that Liam had already endured multiple traumas prior to hospitalization. These additional traumas included a fracture to Liam's left leg, with accompanying soft tissue damage and swelling; fractures to his right shoulder; healing lesions to the tip of his penis; and a skull fracture, with associated cranial hemorrhages and swelling. Both respondent, Liam's mother, and

Liam's father claimed that the injuries occurred when Liam's father accidentally dropped Liam. The Onslow County Department of Social Services (DSS) conducted its initial inspection of the family home and found the house "very dirty, with a sticky residue on the floor and a strong odor of urine."

DSS subsequently filed a juvenile petition alleging that Liam was an abused and neglected juvenile. The petition alleged that Liam's injuries and clinical presentation were "most consistent with a medical diagnosis of abusive head trauma and non-accidental trauma." The petition further alleged that the parents' "stated history of [Liam's] trauma" did "not explain the severity or extent of the child's injuries." Liam's parents were his sole caretakers. Therefore, to ensure the immediate safety of Liam, DSS sought and obtained nonsecure custody of him that same day.

Liam's injuries were life-altering. Now, at age four, he suffers from cerebral palsy, continued seizures, developmental delay, and a possible intellectual disability. In addition, Liam lacks full awareness of his right hand and arm due to the long-term effects of his head injury. As a result, Liam requires around-the-clock care and constant medical consultations, including six therapeutic appointments each week, bi-annual neurology monitoring, and regular gastroenterologist visits.

Both parents were arrested and charged with felony child abuse. On 16 July 2020, respondent, who had bonded out of jail and moved to Georgia, entered a case plan with DSS which required that she complete recommended parenting classes and demonstrate learned skills, complete a comprehensive clinical assessment for mental

health, and participate in Liam's ongoing medical appointments. Still to this day, respondent has never plausibly explained Liam's injuries, nor participated in a single one of Liam's medical appointments as ordered by the court.

After being discharged from the hospital, Liam was placed with his foster family, petitioners, Daniel and Jessica Hall. Liam is now four years old, and petitioners are the only family he can remember. He has a loving relationship with petitioners, and considers their children his siblings. Jessica Hall has been instrumental in Liam's recovery. She schedules and attends each of Liam's medical appointments and stays at home to provide the continuous extensive care he now requires. Petitioners have provided Liam a stable, nurturing environment in which to flourish.

Before the first permanency-planning hearing in this case, Liam's maternal grandfather expressed an interest in obtaining Liam's custody; however, the maternal grandfather barely knows Liam. Moreover, by his own admission, the grandfather is unable to provide for Liam's around-the-clock medical care; instead, the grandfather claims that his live-in girlfriend would be.

These circumstances did not go unnoticed by Liam's guardian ad litem (GAL). A GAL is a trained volunteer who is wholly invested in the juvenile's best interests during abuse and neglect proceedings.[2] Among a GAL's statutory duties are

---

[2] N.C. Jud. Branch, *About Guardian ad Litem (GAL)*, https://www.nccourts.gov/programs/guardian-ad-litem/about-guardian-ad-litem-gal#:~:text=Guardians%20ad%20Lit

-4-

"offer[ing] evidence and examin[ing] witnesses at adjudication; [ ] explor[ing] options with the court at the dispositional hearing;" and "protect[ing] and promot[ing] the best interests of the juvenile." N.C.G.S. § 7B-601(a) (2023). Pivotal to this role is the creation and maintenance of independent reports for the courts to review.[3]

In the GAL's report, the GAL was adamant that Liam remain with petitioners. The GAL reported that as a result of his extensive injuries "Liam requires 24-hour care [that] will continue through his entire life." Petitioners currently provide and are committed to providing that continued care in the future. The report further explains that, in addition to the petitioners' proven ability to provide for all of Liam's medical needs, Liam "will shut down and become unresponsive" "if the foster mother[,] [petitioner,] is not present." This is because "[Liam's] cognitive abilities are very limited such that he does not understand being away from his foster mother." Moreover, the report emphasized that all of "[Liam's] therapists agree that if [Liam] is removed from [petitioners' care], his condition will severely deteriorate."

Despite Liam's demonstrated extraordinary needs and the GAL's strong recommendation that Liam stay with petitioners, DSS recommends that it is in Liam's best interest that he move to the maternal grandfather's home in Georgia.

---

em%20are%20appointed,that%20belongs%20to%20the%20community (last visited Dec. 5, 2024).

[3] N.C. Jud. Branch, *Volunteer as a GAL* https://www.nccourts.gov/programs/guardian-ad-litem/volunteer-as-a-gal (last visited Dec. 5, 2024).

**B. Procedural Background**

The trial court adjudicated Liam as abused and neglected on 22 September 2021, which neither parent contested.

In December 2021, the initial permanency-planning hearing was held. The trial court entered an initial permanency-planning order on 18 January 2022. That order found in part that "[DSS] would like to see respondent . . . scheduling [more] phone visits with [Liam]." The court further found that DSS is "concerned with [Liam] returning to the care of respondent mother due to [Liam's] extensive injuries and exceptional needs." The trial court also stated that it "would like to hear from both respondent mother and [the maternal grandfather] about what they will be willing to do to get [Liam] his needed medical care and what their plan is for [Liam's] care if he is placed with them in Georgia." The trial court ordered that the primary plan for Liam be reunification with his parents and that the secondary plan be custody of Liam with a court-approved caretaker, like petitioners.

At the beginning of May 2022, a second permanency-planning hearing was held. The resulting order found again that "[DSS] would like to see respondent mother scheduling [more] phone visits with [Liam]." The court also reiterated its concerns with returning Liam to respondent "due to [Liam's] extensive injuries and exceptional needs." The trial court's primary and secondary permanency plans remained unchanged.

One month later, a third permanency-planning hearing was held. At this time,

Daniel Hall, a Major in the United States Marine Corps, had received military orders which required moving the family to Florida permanently. The permanency-planning order remained substantially the same with the exception that the trial court approved the petitioners' "go[ing] on an extended visit with the juvenile in Florida."

The fourth and final permanency-planning hearing was held across the first two days of August 2022. The resulting order (final order) from this hearing made a number of findings, including findings number six and ten. Finding number six stated: "The [c]ourt received into evidence the court report of the Guardian Ad Litem." Finding number ten stated: "That the [c]ourt has considered information from any person designated by N.C.G.S. § 7B-906.1(c)."[4] It is therefore evident that the trial court heard and considered the GAL report. The Court then granted legal and physical custody of Liam to petitioners.[5]

Respondent appealed the final order to the Court of Appeals. Respondent argued that the trial court erred in ceasing reunification as a permanent plan and by awarding custody of Liam to his foster parents. *In re L.L.*, No. COA22-1045, slip op. at 8 (N.C. Ct. App. Nov. 21, 2023) (per curiam) (unpublished). Respondent challenged, first, various factual findings in the trial court's order, and then disputed the sufficiency of those findings to satisfy the relevant statutory provisions. In a per curiam, unpublished decision, the Court of Appeals rejected the first challenge but

---

[4] N.C.G.S. § 7B-906.1 states in pertinent part, "[a]t each hearing, the court shall consider information from [ ] the guardian ad litem."

[5] Judge Bateman presided during this entire permanency-planning process.

agreed with the second. *In re L.L.*, slip op. at 16–17. In the court's view, the findings were insufficient to comply with the relevant statutory provisions. Accordingly, the Court of Appeals vacated the trial court's order and remanded the matter for a new permanency-planning hearing to be held. *Id.* at 25.

Petitioners filed for discretionary review with this Court pursuant to N.C.G.S. § 7A-31 (2023). We allowed the petition.

## II. Standard of Review

Respondent did not appeal the Court of Appeals' holding that the trial court's findings of fact were supported by competent evidence. Therefore, those findings are binding on appeal. *In re J.M.*, 384 N.C. 584, 591 (2023). The only question before this Court is whether the trial court's findings are sufficient under the relevant statutory provisions.

This Court interprets statutory provisions de novo. *State v. J.C.*, 372 N.C. 203, 206 (2019) (citation omitted). Moreover, "[t]he trial court's dispositional choices—including the decision to eliminate reunification from the permanent plan—are reviewed for abuse of discretion." *In re J.M.*, 384 N.C. at 591 (extraneity omitted). "An abuse of discretion is shown where a trial court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re A.A.*, 381 N.C. 325, 338 (2022) (extraneity omitted).

## III. Analysis

"The provisions in Chapter 7B (Juvenile Code) of our General Statutes reflect

the need both to respect parental rights and to protect children from unfit, abusive, or neglectful parents." *In re J.M.*, 384 N.C. at 591–92 (extraneity omitted). The Juvenile Code divides abuse, neglect, and dependency proceedings into two main phases: adjudicatory and dispositional. At the adjudicatory phase, the Department of Social Services must show by "clear and convincing evidence" that a juvenile qualifies as "abused, neglected, or dependent" as defined by the Juvenile Code. N.C.G.S. §§ 7B-101, -805 (2023). If shown, the proceedings move on to the dispositional phase. At the dispositional phase, the court's task "is to design an appropriate plan to meet the needs of the juvenile and to achieve the objectives of the State in exercising jurisdiction." *Id.* § 7B-900 (2023).[6]

The challenges at issue here were made in the dispositional phase. At this phase, the trial court may select or combine various alternatives for disposition, including placing the juvenile "in the custody of a parent, relative, private agency . . . , or some other suitable person." *See id.* § 7B-903(a) (2023). The "polar star" guiding the trial court's decision is "the best interests of the juvenile." *Id.* § 7B-100(5) (2023) (explaining that "the best interests of the juvenile are of paramount consideration by the court"); *see also In re Montgomery*, 311 N.C. 101, 109 (1984) (emphasizing that "the best interest of the child is the polar star"). Several statutory provisions direct the trial court's analysis of the best interests of the juvenile. *See* N.C.G.S. §§ 7B-906.1, 7B-906.2, 7B-903 (2023).

---

[6] Those objectives are set out in N.C.G.S. § 7B-100 (2023).

Petitioners argue the Court of Appeals erred by holding that the trial court failed to make sufficient findings under four subsections of those statutory provisions: N.C.G.S. §§ 7B-906.1(e), 7B-906.2(b), 7B-906.2(d), and 7B-903(a1). We agree with petitioners and address each provision in turn.

**A.  N.C.G.S. § 7B-906.1(e)**

Subsection 7B-906.1(e) requires the trial court, "[a]t any permanency planning hearing where the juvenile is not placed with a parent" to "additionally consider the following criteria and make written findings *regarding those that are relevant.*" *Id.* § 7B-906.1(e) (emphasis added). One of those criteria includes "[w]hether it is possible for the juvenile to be placed with a parent within the next six months . . . ." *Id.* The Court of Appeals held that this subfactor was not satisfied because "the permanency planning order contains no mention of Liam's placement with [respondent] mother within the six months following the order." *In re L.L.*, slip op. at 17.

The Court of Appeals failed to follow the plain language of the statute in reaching its holding. The plain language of this subsection states that the trial court must consider all enumerated criteria but need only "make written findings regarding those that are *relevant.*" N.C.G.S. § 7B-906.1(e) (emphasis added). In other words, the Court of Appeals read out the key phrase "that are relevant." This omission of words runs counter to the long-standing surplusage canon of statutory interpretation. *See e.g., In re B.O.A.*, 372 N.C. 372, 380 (2019) ("In construing statutory language, 'it is our duty to give effect to the words actually used in a statute and not to delete words

used or to insert words not used.' " (quoting *Lunsford v. Mills*, 367 N.C. 618, 623 (2014))).

Moreover, "that are relevant" appears identically in another provision of our Juvenile Code. *Compare* N.C.G.S. § 7B-906.1(e), *with* N.C.G.S. § 7B-1110(a) (2023). Our previous interpretation of this identical phrase comes as no surprise. We interpreted this phrase to only require written findings for those *criteria that are relevant. In re A.U.D.*, 373 N.C. 3, 10 (2019) ("The statute does not, however, explicitly require written findings as to each factor."). This plain language interpretation is aligned with the well-established principle that "words used in one place in a statute have the same meaning in every other place in the statute." *State v. Rogers*, 371 N.C. 397, 403 (2018) (extraneity omitted). Accordingly, we hold that only relevant criteria require written findings under N.C.G.S. § 7B-906.1(e). The trial court has discretion to determine which factors were relevant.

Here the trial court did not need to make written findings as to whether Liam could be placed with respondent in the next six months. It was uncontested that Liam could not. Throughout the permanency-planning process, no party advocated that respondent should receive custody of Liam within the next six months. Instead, the parties contested whether Liam should remain with petitioners or be transferred to the care of the maternal grandfather. In fact, DSS affirmatively agreed that respondent should not receive custody of Liam. Indeed, the DSS court report stated

that it "still has concerns" about placing Liam with respondent "due to the severe abuse and injuries that [Liam] sustained without explanation from the parents."

The record therefore reveals that it was uncontested that Liam would not be placed in respondent's care within the next six months. As we stated before, where factors are uncontested there is no reason for the trial court to make written findings about them. *See In re A.K.O.*, 375 N.C. 698, 704 (2020) (clarifying that the identical phrase does not require written findings as to each factor, "particularly when there was no conflict in the evidence regarding those factors"). Accordingly, the trial court did not abuse its discretion by choosing not to make a written finding on this uncontested criterion.

Even still, the trial court's consideration of "[w]hether it is possible for the juvenile to be placed with a parent within the next six months" can be properly inferred from the findings. *See, e.g., In re L.R.L.B.*, 377 N.C. 311, 323 (2021) (encouraging appellate courts to draw plausible inferences from findings to determine simply whether the "trial court adequately address[ed] the substance and concerns of [the statute]").

The trial court's previous permanency-planning orders had repeatedly found "[t]hat it is not likely that [Liam] will be returned home within the next six (6) months and placement with a parent is not in [Liam's] best interests because, neither parent is able to explain how [Liam] sustained the serious injuries." Then, in the final order the trial court found again that "[t]he parents were and are unable to provide any

plausible explanation as to the cause of the injuries." From the context of these prior uncontested orders, an appellate court can reasonably draw the plausible inference that placement with a parent was not possible.

Moreover, the final order found Liam's injuries were the result of "non-accidental trauma" while in "the exclusive care" of respondent and Liam's father, and that both parents have been "unable to provide any plausible explanation as to the cause of the injuries." Collectively, these findings, too, create the plausible inference that placement with either parent was not possible. *See, e.g., In re L.R.L.B.*, 377 N.C. at 323 (concluding that a finding that the respondent-mother was living with a domestic abuser was sufficient to infer that the trial court considered whether respondent was acting consistent with the juvenile's health or safety).

Liam could not be placed with respondent in the next six months because the very problems that necessitated Liam's removal had not been resolved. *See id.* (reasoning that, "the very problems that necessitated [the juvenile's] removal from the home" had not changed and therefore "returning [the juvenile] to his parents' home would be 'contrary to his welfare and best interests' "). Moreover, respondent failed to comply with the part of the plan specifically designed to address the devastating effect of these injuries; for instance, respondent has not participated in any of Liam's multiple weekly medical appointments. These findings adequately address the substance and concerns of N.C.G.S. § 7B-906.1(e).

Consistent with this Court's previous holdings, we conclude that the trial court did not abuse its discretion by failing to make written findings of fact regarding uncontested statutory factors. This conclusion alone is sufficient to support our holding that the trial court did not err under N.C.G.S. § 7B-906.1(e). Even still, we further conclude that the trial court *did* make sufficient findings for a reviewing court to draw the plausible inference that the juvenile's placement with a parent is unlikely within six months. Accordingly, we hold that the trial court did not err in its application of N.C.G.S. § 7B-906.1(e).

## B. N.C.G.S. §§ 7B-906.2(b) and 7B-906.2(d)

The next provisions at issue govern the feasibility of reunification. "The goal of the permanency planning process is to 'return the child to their home or when that is not possible to a safe, permanent home within a reasonable period of time.'" *In re J.M.*, 384 N.C. at 593 (quoting Sara DePasquale, *Abuse, Neglect, Dependency and Termination of Parental Rights Proceedings in North Carolina* 7–10 (UNC School of Government 2022)). Aligned with this goal, reunification ordinarily must be the primary or secondary plan in a juvenile's permanency plan. N.C.G.S. § 7B-906.2(b).

Yet, "[t]he requirement to make reunification the primary or secondary plan is not absolute." *In re J.M.*, 384 N.C. at 594. Reunification is no longer required where "the [trial] court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." *See* N.C.G.S. § 7B-906.2(b). Further, the court must make written findings at each

permanency hearing regarding certain factors listed in N.C.G.S. § 7B-906.2(d), "which shall demonstrate the degree of success or failure toward reunification." *See id.* § 7B-906.2(d). These factors are:

> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>
> (2) Whether the parent is actively participating in or cooperating with the plan, the department [of Social Services], and the guardian ad litem for the juvenile.
>
> (3) Whether the parent remains available to the court, the department [of Social Services] and the guardian ad litem for the juvenile.
>
> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

*Id.* § 7B-906.2(d) (2023).

At the outset, we reiterate this Court's previously articulated standard for written findings under the Juvenile Code. Specifically, the trial court's written findings need not track the statutory language verbatim, but "they must make clear that the trial court considered the evidence in light of whether reunification would be clearly unsuccessful or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time." *In re J.M.*, 384 N.C. at 594 (extraneity omitted) (referencing N.C.G.S. § 7B-906.2).

Similarly, in keeping with this Court's approach under N.C.G.S. §§ 7B-906.1(e) and 7B-1110(a), we recognize the Juvenile Code's flexibility for written findings that are responsive to each permanency-planning dispute. Subsection § 906.2(d) requires

written findings "which shall demonstrate the degree of success or failure toward reunification." N.C.G.S. § 7B-906.2(d). We therefore hold that only those factors which demonstrate the degree of success or failure toward reunification require written findings.

The Court of Appeals held that the trial court failed to make sufficient findings under N.C.G.S. §§7B- 906.2(b) and 7B-906.2(d)(2)–(d)(4). *In re L.L.*, slip op. at 19–20. We disagree. As discussed below, a careful examination of the final order and its incorporated findings confirms that these statutory requirements have been met.

### 1. *N.C.G.S. §§ 7B-906.2(b) and 7B-906.2(d)(4)*

Subsection § 7B-906.2(b) is synonymous with N.C.G.S. § 7B-906.2(d)(4) and therefore warrants the same analysis. Both require written findings that demonstrate reunification is inconsistent with the health or safety of the juvenile. The final order, while not tracking the statutory language verbatim, did just that.

The final order found that Liam suffered severe injuries from abuse while in respondent's and Liam's father's care, that respondent has never plausibly explained the cause of those injuries, that respondent was charged with felony child abuse, and that respondent has failed to comply with trial court orders to participate in Liam's medical appointments to familiarize herself with the "extreme medical needs" of Liam. While not quoting its exact language, the final order's written findings clearly address the statute's concerns. *See In re L.M.T.,* 367 N.C. 165, 168 (2013) ("The trial court's written findings must address the statute's concerns, but need not quote its

exact language."); *see also In re J.M.,* 384 N.C. 584 (2023).

Moreover, due regard for our own precedent requires us to hold that such findings are sufficient. This Court has repeatedly held that a parent's failure to offer an honest explanation for his or her child's injuries while the child was in that parent's sole custody can satisfy N.C.G.S. §§ 7B-906.2(b) and 7B-906.2(d)(4). *See In re J.M.,* 384 N.C. at 602 ("[T]he record evidence in this case provides ample basis for the trial court's determination that respondents' persistent unwillingness to acknowledge responsibility for [the juvenile's] life-threatening injuries would render further efforts at reunification clearly unsuccessful and 'inconsistent with the [juveniles'] health or safety.'" (second alteration in original)); *see also In re D.W.P.*, 373 N.C. 327, 338 (2020) (observing that "[w]ithout recognizing the cause of [the juvenile's] injuries, respondent-mother cannot prevent them from reoccurring"; therefore, termination of parental rights was proper). After all, a permanency-planning order is not a final order and may be modified at any time in response to new developments in a case, such as offering an honest explanation for Liam's injuries or attending medical appointments to understand the care Liam requires. *See In re J.M.*, 384 N.C. at 602 (noting the same).

In summary, the final order made findings that respondent failed to take responsibility for the severe abuse to Liam that occurred while in respondent's care. This alone is sufficient. But the final order went further. The trial court found that respondent failed to comply with numerous trial court orders which directed

respondent to make an effort to understand the life-altering impact of that abuse on Liam. These findings address the statute's concerns and amount to more than enough support for the conclusion that reunification is inconsistent with the health or safety of Liam.

Accordingly, the record evidence and our caselaw confirm that the written findings contained in the final order fulfill the requirements of N.C.G.S. §§ 7B-906.2(b) and 7B-906.2(d)(4). The trial court did not err in its assessment of the reunification issue.

### 2. N.C.G.S. §§ 906.2(d)(2) & (d)(3)

Subfactors §§ 7B-906.2(d)(2) and 7B-906.2(d)(3) relate to respondent's cooperation and progress with her case plan and her interactions with the trial court. *See* N.C.G.S. § 7B-906.2(d)(2) ("Whether the parent is actively participating in or cooperating with the plan, the department [of social services], and the guardian ad litem for the juvenile."); *see also id.* § 7B-906.2(d)(3) ("Whether the parent remains available to the court, the department [of social services] and the guardian ad litem for the juvenile.").

The Court of Appeals concluded that "there are no findings that address whether [respondent] had cooperated with DSS or the guardian ad litem, as required by [N.C.G.S. §] 7B-906.2(d)(2)." *In re L.L.*, slip op. at 19. The court additionally opined that "[s]imilarly, no findings address the considerations of [N.C.G.S. §] 7B-906.2(d)(3)." *Id.*

It appears that the Court of Appeals did not properly consider the DSS court report that the trial court incorporated by reference into its final order. When trial courts incorporate documents by reference, the factual findings contained in those documents—but not their opinions or recommendations—become the findings of the trial court's order. *See In re K.N.*, 378 N.C. 450, 459 (2021) (examining external files of which the trial court took judicial notice).

The DSS report listed in chronological order all contact maintained by both parents with the trial court, DSS, and the GAL. The report also noted that respondent "has travel[ed] to several court hearings"; and the report explicitly listed all prior legal proceedings in this matter. The DSS report further detailed respondent's participation with her case plan, including completing a parenting class, participating in therapy, and obtaining housing; yet the report also noted respondent's failure to attend Liam's medical appointments as ordered by the court. Taken together, these incorporated facts exhibit respondent's availability to the trial court and the GAL under N.C.G.S. § 7B-906.2(d)(3), as well as her participation with the plan, DSS, and the GAL under N.C.G.S. § 7B-906.2(d)(2). Once again, the trial court is not obligated to recite the statutory language. *In re J.M.*, 384 N.C. at 594.

Furthermore, as we have explained above, the trial court has discretion whether to make written findings under N.C.G.S. § 906.2(d). Only those factors that demonstrate the degree of success or failure toward reunification require written findings. Consequently, the trial court was not required to mechanically recite such

inapplicable subfactors.

For these reasons, the trial court did not abuse its discretion. Accordingly, we conclude the trial court did not err by failing to satisfy the requirements under N.C.G.S. §§ 7B-906.2(d)(2) and 7B-906.2(d)(3).

## C. N.C.G.S. § 7B-903(a1)

Subsection § 7B-903(a1) guides a trial court's placement of the juvenile. It provides a statutory preference for the placement of the juvenile with a relative. The subsection states:

> In placing a juvenile in out-of-home care under this section, the court *shall first* consider whether a relative of the juvenile is willing and able to provide proper care and supervision of the juvenile in a safe home. If the court finds that the relative is willing and able to provide proper care and supervision in a safe home, then the court *shall order* placement of the juvenile with the relative *unless* the court finds that the placement is contrary to the best interests of the juvenile.

N.C.G.S. § 7B-903(a1) (emphases added). The Court of Appeals reasoned that the trial court erred because its "findings were insufficient to overcome the statutory preference for placement with a willing and able relative." *In re L.L.*, slip op. at 20.

The Court of Appeals read the subsection as a directive to the trial court to *first* "make findings" as to "whether the maternal grandfather is willing and able to provide proper care and supervision for Liam, which can include appropriate care provided by other parties during the maternal grandfather's workday." *Id.* at 24. *Then*, "[i]f the court determines placement with the maternal grandfather is not in

Liam's best interests, that determination must be supported with and based on findings explaining why." *Id.*

Notably, however, N.C.G.S. § 7B-903(a1)'s language does not require the trial court to make any written findings, but rather to "*consider* whether a relative of the juvenile is willing and able to provide proper care and supervision of the juvenile in a safe home." N.C.G.S. § 7B-903(a1) (emphasis added).

This language is in contrast to the language contained in N.C.G.S. § 7B-906.1(e). *See id.* § 7B-906.1(e). As previously discussed, N.C.G.S. § 7B-906.1(e) *does* require written findings for those *relevant* subfactors. This requirement is justified by the plain language of N.C.G.S. § 7B-906.1(e) which states that "the court *shall* additionally *consider* the following criteria *and make written findings* regarding those that are relevant." *Id.* (emphases added). Subsection § 7B-906.1(e) makes clear that when the legislature intends a "written findings requirement," it states just that. In contrast, N.C.G.S. § 7B-903(a1) says nothing about written findings. Therefore, we presume the legislature did not intend to impose a written findings requirement in N.C.G.S. § 7B-903(a1) because it did not state one. *See State v. Baker*, 229 N.C. 73, 77 (1948) ("It is reasonable to assume that the Legislature comprehended the import of the words it employed to express its intent when it enacted the statutes [at issue].").

Moreover, the language of the subsection does not support the Court of Appeals' interpretation that the trial court must consider in a vacuum whether placement with the maternal grandfather was contrary to Liam's best interests. *See*

*In re L.L.*, slip op. at 24 ("The statute requires a full analysis of a relative placement prior to *any* consideration of a non-relative placement."). To be sure, it would be functionally impossible for the trial court to determine which placement option is in the "best interests" of the juvenile without considering and comparing all the placement options.[7]

Whether the trial court properly considered N.C.G.S. 7B-903(a1) is reviewed for abuse of discretion.

Here the trial court certainly considered whether the maternal grandfather was "willing and able" to care for Liam. The maternal grandfather testified extensively at the hearing about his willingness and ability to take custody of Liam. The trial court then expressly found "[t]hat it is in the best interests of [Liam] that his custody be granted to [petitioners]." The trial court then made twelve additional findings outlining why placement with petitioners was better for Liam than placement with the maternal grandfather.

For example, despite the maternal grandfather's testimony regarding his capacity to care for Liam, the trial court was doubtful based on its finding that he "is employed full-time and unable to provide the type of childcare necessary to meet [Liam's] needs." Instead, the trial court found that the grandfather's girlfriend, who

---

[7] To the extent the Court of Appeals' opinion might be read to mean that subsection 7B-903(a1) requires a specific arrangement of written findings, we reject any such understanding. Subsection 7B-903(a1) does not require any specific sequence of findings in the trial court's order.

"is not related by blood or marriage to [Liam]," would care for him. Moreover the court found that, "[Liam] has not had significant regular contact with [the grandfather] or [his girlfriend] sufficient to form a close bond with them." At the hearing, the trial court even voiced concern that neither the maternal grandfather nor his girlfriend had ever actually talked with Liam's doctors to understand the level of medical care Liam requires.

It is evident from the trial court's findings that it did consider placement of Liam with the grandfather as the statute requires. However, the trial court was unconvinced that placement with the grandfather—who lacked knowledge of the full extent of Liam's medical needs, who worked full-time, and who lacked any bond with Liam—was in Liam's best interests. This reflects the trial court's proper exercise of its function as a factfinder. *In re N.C.E.*, 379 N.C. 283, 292 (2021) ("[I]t was the trial court's role as fact-finder 'to pass upon the credibility of the witnesses and the weight to be given their testimony and the reasonable inferences to be drawn therefrom.' " (quoting *In re A.R.A.*, 373 N.C. 190, 196 (2019) (extraneity omitted))).

In contrast, the trial court also made numerous findings in the final order regarding the placement of Liam with petitioners. The trial court found that "[Liam] has been living with the Hall's for twenty-six months, [and] they are the only 'family' that he is familiar with." The court further found that "[Liam] has a close, loving, and bonded relationship in the nature of a parent/child relationship with the Hall's and . . . their children." Moreover, the court found that "[petitioners] have demonstrated

over the past twenty-six months that they are willing and able to provide for all of [Liam's] special and intensive needs." These trial court findings adequately demonstrate that placement with the maternal grandfather was not in Liam's best interests.

Furthermore, in findings of facts numbers six and ten, the trial court confirmed that it *considered* the GAL's report that was received into evidence. This report evidenced the GAL's strong recommendation that Liam remain with the petitioners. As stated above, the GAL reported that as a result of his extensive injuries "Liam requires 24-hour care [that] will continue through his entire life." Petitioners currently provide and are committed to providing that continued care in the future. The report further explains that, in addition to the petitioner's proven ability to provide for all of Liam's medical needs, Liam "will shut down and become unresponsive" "if the foster mother[, petitioner,] is not present." This is because "[Liam's] cognitive abilities are very limited such that he does not understand being away from his foster mother." Moreover, the report emphasized that all of "[Liam's] therapists agree that if [Liam] is removed from [petitioners' care], his condition will severely deteriorate."

The hearing testimony, reports, and resulting final order indicate that the trial court considered placement with the maternal grandfather. The trial court's consideration of the maternal grandfather but ultimate decision to place Liam with petitioners instead is not manifestly unsupported by reason. We therefore conclude

that the trial court did not abuse its discretion and thus satisfied the plain language of N.C.G.S. § 7B-903(a1).

## IV.    Conclusion

In this case, the trial court removed an infant from the custody of his parents after one or both parents inflicted life-altering injuries upon him. Confronted with the severity of the abuse, the unwillingness of either parent to admit responsibility, the extensive ongoing needs of the child as a result of this unexplained abuse, and the failure of respondent to gain an understanding of the child's medical needs as the court repeatedly ordered, the trial court determined that reunification with respondent and placement of the child with respondent's father would be inconsistent with the child's health or safety. We hold that those findings contained in the trial court's order are sufficient to satisfy the provisions of N.C.G.S. §§ 7B-906.1(e), 7B-906.2(b), 7B-906.2(d), and 7B-903(a1). Accordingly, we reverse the decision of the Court of Appeals and affirm the trial court's order awarding full custody of Liam to petitioners and converting the case to a Chapter 50 civil custody proceeding.

REVERSED.

Justice RIGGS concurring in part and dissenting in part.

Liam's short life has already been harder than any child's life should be, and I understand the resistance to disrupting the stability he has found with his foster parents. However, as judges, emotion plays no role in our obligation to apply the law and defer to the legislature's policy decisions. In difficult situations like this, the General Assembly has evinced a clear preference that children should be placed with willing and able relatives rather than with the department of social services or a foster family. *See* N.C.G.S. § 7B-903(a1) (2023) ("In placing a juvenile in out-of-home care under this section, the court shall first consider whether a relative of the juvenile is willing and able to provide proper care and supervision of the juvenile in a safe home."). The preference for relative placement is rooted in the state's objective to "design an appropriate plan to meet the needs of the juvenile" and "strengthen the home situation" with appropriate community-level resources. *Id.* § 7B-900 (2023). This direction aligns with the federal requirement that state foster care systems "shall consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child" to be eligible for federal social security grants. 42 U.S.C. § 671(a)(19).

Here, the majority's statutory interpretation of N.C.G.S. § 7B-903(a1) contradicts the General Assembly's clear policy preference for placement of children with willing and able relatives. The majority's decision allows direct comparison of

relative placement with foster care placements and runs the risk of introducing class bias into child placement decisions. Further, the majority weakens the statutory requirement that the trial court make specific findings of fact at each permanency planning hearing and before eliminating reunification with the child's parent under N.C.G.S. § 7B-906.2. This majority's decision to disregard the statutory requirements for written findings will only serve to frustrate the ability of appellate courts to engage in meaningful review of disposition orders under Chapter 7B. For these reasons, I respectfully dissent in part. I concur in part with the majority's decision that N.C.G.S. § 7B-906.1(e) only requires written findings as to the factors that are relevant to the case.

## I. Analysis

## A. Preference for Relative Placement Under N.C.G.S. § 7B-903(a1).

In interpreting N.C.G.S. § 7B-903(a1), the majority first concluded that a trial court is not required to make any written findings establishing that the trial court first considered a family placement because, unlike other statutes, the statutory language of N.C.G.S. § 7B-903(a1) does not explicitly require the trial court to make written findings. The statute, however, requires if the trial court "*finds* that the relative is willing and able to provide proper care and supervision in a safe home, then the court *shall* order placement of the juvenile with the relative unless the court finds that the placement is contrary to the best interests of the juvenile." N.C.G.S. § 7B-903(a1) (emphases added). Second, the majority effectively writes the preference

for relative placement out of the statute by concluding—contrary to the plain language of the statute—that the trial court can compare a foster care placement to a relative placement. I disagree with both conclusions.

First, findings of fact play an important role in the legal system by allowing appellate courts to engage in meaningful review of the trial court's decision. *See State v. Jordan*, 385 N.C. 753, 757 (2024) (recognizing that when the trial court does not make findings of fact, the lack of findings frustrates the ability of appellate courts to engage in appellate review because the appellate court has no underlying facts to which it can apply the law). In reviewing a disposition order, like the order in this case, appellate courts consider whether the findings of fact support the conclusions of law. *See, e.g., In re J.M.*, 384 N.C. 584, 591 (2023) ("Appellate review of a trial court's permanency planning order is restricted to whether there is competent evidence in the record to support the findings of fact and whether the findings support the conclusions of law." (cleaned up)); *In re J.D.R.*, 239 N.C. App. 63, 66 (2015) ("On appeal from the trial court's disposition order, we must determine (1) whether the trial court's findings of fact are supported by clear and convincing evidence, and (2) whether its conclusions of law are supported by the findings.").

When the trial court does not provide findings of fact to support a conclusion that relative placement is "contrary to the best interests of the juvenile," N.C.G.S. § 7B-903(a1), then the appellate court will have no choice but to remand for additional findings or essentially abandon any meaningful appellate review. *See, e.g., In re*

*L.R.L.B.*, 377 N.C. 311, 326 (2021) (remanding for additional findings of fact sufficient for appellate review regarding whether the trial court contemplated N.C.G.S. § 7B-906.2(d)(3)); *In re N.K.*, 375 N.C. 805, 824–25 (2020) (remanding for findings regarding whether the department of social services complied with notice requirements under the Indian Child Welfare Act). Although this statute does not explicitly require findings of fact to demonstrate that the trial court first considered relative placement, such findings would be consistent with the legislature's commitment to creating records that allow for meaningful appellate review. *See Coble v. Coble*, 300 N.C. 708, 712 (1980) ("The requirement for appropriately detailed findings is thus not a mere formality or a rule of empty ritual; it is designed . . . to allow the appellate courts to perform their proper function in the judicial system." (cleaned up)). Findings are necessary to demonstrate whether the trial court appropriately considered the relative placement before making a permanent placement decision. Consistent with the design and practice of all juvenile cases, to minimize disruptive revisiting of placement decisions during appellate review, I believe the General Assembly did indeed intend for trial courts to make findings of fact that it "first consider[ed]" whether placement with a relative would be "contrary to the best interests of the juvenile." N.C.G.S. § 7B-903(a1).

Second, the majority asserts that "it would be functionally impossible for the trial court to determine which placement option is in the 'best interests' of the juvenile, without considering and comparing all the placement options." Therefore,

in the majority's view, the trial court must compare a relative placement with a foster care placement and award custody to the "better" placement between the two.

This interpretation is obviously contrary to the plain language of N.C.G.S. § 7B-903(a1). It is hard to imagine that the legislature could have been clearer. "[T]he court shall *first consider* whether a relative of the juvenile is willing and able to provide proper care and supervision of the juvenile in a safe home." N.C.G.S. § 7B-903(a1) (emphasis added). There is simply no reasonable interpretation of this statutory language to allow for a comparison between a relative placement and a foster care placement. "If the court finds that the relative is willing and able to provide proper care and supervision in a safe home, then the court *shall* order placement of the juvenile with the relative unless the court finds that the placement is contrary to the best interests of the juvenile." *Id.* (emphasis added). "It is well established that the word 'shall' is generally imperative or mandatory when used in our statutes." *Morningstar Marinas/Eaton Ferry, LLC v. Warren County.*, 368 N.C. 360, 365 (2015) (cleaned up) (quoting *Multiple Claimants v. N.C. Dep't of Health & Hum. Servs.*, 361 N.C. 372, 378 (2007)). Thus, the statute mandates that the trial court consider the suitability of a relative placement before it even considers the foster care placement. Direct comparison of the placements contradicts the plain language of the statute.

Sensible policy reasons explain why the legislature did not adopt the approach the majority takes today. Directly comparing foster care placements to relatives

creates a troubling environment where foster or adoptive placements with more financial means or two-parent households have an advantage over less affluent or single relatives. The state has no business deciding whether a nicer house or access to a car means that a non-relative placement is better for the child than a relative placement. Put simply, the majority opens the door for classist biases and assumptions to pour into trial courts' considerations of placement and best interest. Family poverty will cost children the opportunity to stay in their community and grow up with their relatives. Working people will be treated as lesser parents than those in households where one or more parents have the privilege of not working outside the home. Economic wealth will determine custody. Opening this door is a terrible injustice for many far outside the confines of this case.

The General Assembly has clearly decided that relative placement is preferred. Today the majority steps beyond its proper role and into the role of legislature by rewriting the statute to, at best, create an even playing field between relative placements and foster care placements and, at worst, disadvantage relative placements because of wealth. *See Brown v. Brown*, 213 N.C. 347, 349 (1938) ("[I]t is a well-settled rule that all questions of public policy are for the determination of the Legislature and not for the courts, it will not be assumed that any statute enacted by the Legislature was intended to override or depart from principles of public policy founded on good morals unless the language of the statute clearly and unequivocally indicates such an intent.").

Beyond this enormous overstep, legally, the majority also is on shaky ground factually. The trial court in this case did not find that placement with Liam's grandfather would be contrary to his best interests, as required by the statute. Instead, the trial court found that "it is in the best interests of the juvenile that his custody be granted to [the Halls.]" The trial court's order includes four findings about placement with the grandfather: (1) "[the grandfather] is employed full-time and unable to provide the type of childcare necessary to meet [Liam's] needs"; (2) "[the grandfather] lives with his [partner], . . . who is willing to provide care for the child"; (3) "[the grandfather's partner] is not related by blood or marriage to [Liam]"; and (4) "[t]he child has not had significant regular contact with [the grandfather] or [the grandfather's partner] sufficient to form a close bond with them."

Concluding that placement with Liam's grandfather is contrary to Liam's best interest simply because the grandfather works full time and Liam's caretaker is not related by blood or marriage necessarily suggests that working parents are somehow less valuable or important than stay-at-home parents. I worry that if the grandfather were employed as an investment banker or in some other occupation that allowed him to pay for professional nurses and therapists to care for Liam all day, then the trial court and the majority might not have had the same concerns about Liam's care during working hours. And that in and of itself is a problem. Here, the record shows that Grandfather is gainfully employed and able to provide for Liam; further, his partner left her job to provide full-time care to meet Liam's unique needs. Absent

further findings, by necessity made in writing, establishing that the trial court found it is contrary to Liam's best interest to be placed with the grandfather, the majority's conclusion unreasonably limits relative placements by approving improper considerations as to who provides care during working hours. *See, e.g.*, *Fisher v. Gaydon*, 124 N.C. App. 442, 445 (1996) (recognizing that the "traditional two-parent model . . . is not the determinative factor qualifying a group of persons as a family" and that "[*u*]*nmarried* parents living with their children have also been accorded recognition as family units"); *see also Moore v. City of E. Cleveland*, 431 U.S. 494, 499 (1977) ("[W]hen the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation.").

For these reasons, I would remand this case to the trial court to make findings about whether placement with Liam's grandfather is contrary to Liam's best interest.

**B. Required Findings Under N.C.G.S. § 7B-906.2(b) & (d).**

The majority also weakens the statutory requirements for findings of fact in other areas of Chapter 7B, specifically the requirement for findings when the trial court ceases reunification efforts with the parents. The decision to cease reunification efforts with a child's parents is a significant step that should not be taken lightly.

For that reason, at a permanency planning hearing during which the trial court decides to cease reunification efforts with the parents, "the court shall make

written findings as to each of the [factors], which shall demonstrate the degree of success or failure toward reunification." N.C.G.S. § 7B-906.2(d) (2023). Additionally, the trial court must make "written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." *Id.* § 7B-906.2(b).

> Although use of the actual statutory language is the best practice, the statute does not demand a verbatim recitation of its language. Instead, the order must make clear that the trial court considered the evidence in light of whether reunification would be futile or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time.

*In re L.E.W.*, 375 N.C. 124, 129–30 (2020) (cleaned up) (considering whether the trial court made the factual findings required by N.C.G.S. § 7B-906.2(b) and (d) in eliminating reunification with the parent).

In this case, the majority concluded the order was sufficient to eliminate reunification for three reasons. First, significantly, the majority holds that the trial court does not need to make written findings about each factor under N.C.G.S. § 7B-906.2(d)—"only those factors that demonstrate the degree of success or failure toward reunification require written findings." This conclusion directly contravenes the plain language of the statute. Second, the majority determined that factual findings contained in documents that have been incorporated by reference become findings of the trial court. This conclusion also runs contrary to the General Assembly's requirement that the trial court make written findings. Finally, the majority

concluded that N.C.G.S. § 7B-906.2(b) is synonymous with N.C.G.S. § 7B-906.2(d)(4), and therefore, separate analysis of the factors is unnecessary. In my view, these required findings address independent issues and warrant separate findings.

### 1. Subsection 7B-906.2(d) Requires Written Findings for Each Factor

First, the majority concluded that only those N.C.G.S. § 7B-906.2(d) "factors that demonstrate the degree of success or failure toward reunification require written findings." The basis for this conclusion was that in other areas of the Juvenile Code, the General Assembly included limiting language that written findings were only required for those factors that were relevant. *See* N.C.G.S. § 7B-906.1(e) (2023) ("[T]he court shall additionally consider the following criteria and make written findings regarding those that are relevant . . . ."; N.C.G.S. § 7B-1110(a) (2023) ("[T]he court shall consider the following criteria and make written findings regarding the following that are relevant . . . ."). The comparison is flawed because the mandate and language in N.C.G.S. § 7B-906.2(d) is markedly different than those other examples. Here, "the court *shall make written findings* as to *each* of the following, which shall demonstrate the degree of success or failure toward reunification." N.C.G.S. § 7B-906.2(d) (emphases added).

The statute instructs that written findings shall be made for all factors, and the second clause provides instructions on the purpose of those findings. *See In re H.A.J.*, 377 N.C. 43, 51 (2021) (affirming the trial court's order after concluding the "trial court's findings of fact establish that it addressed *each of the factors* specified

in N.C.G.S. § 906.2(d)" (emphasis added)). The majority relied upon the clause "which shall demonstrate the degree of success or failure toward reunification" to support its conclusion that findings are not required for all factors. But of course, the basic rules of grammar tell us that a phrase introduced by the word "which" is a nonrestrictive clause, and the omission of the clause does not change the meaning of the sentence. *See* Bryan A. Garner, *The Redbook: A Manual on Legal Style*, § 13.3, at 342 (5th ed. 2023) ("*Which* introduces a nonrestrictive clause, one set off by commas and whose omission would not change the meaning . . . ."); *see also Smith Chapel Baptist Church v. City of Durham*, 350 N.C. 805, 811 (1999) ("Ordinary rules of grammar apply when ascertaining the meaning of a statute." (quoting *Dunn v. Pac. Emps. Ins. Co.*, 332 N.C. 129, 134 (1992))). Therefore, the sentence requiring findings under N.C.G.S. § 7B-906.2(d) can only properly be read as written: "[T]he court shall make written findings as to each of the following[.]" N.C.G.S. § 7B-906.2(d). For that reason, I would hold that N.C.G.S. § 7B-906.2(d) requires the trial court to make written findings as to each factor.

### 2. *The Trial Court—Not the Reference Documents—Makes the Findings of Fact*

Second, the majority creates a novel standard that "factual findings contained in [reference] documents" become findings of the trial court. Relying upon this Court's decision in *In re K.N.*, 378 N.C. 450 (2021), the majority says that the trial court does not need to make written findings; rather, the appellate court can use factual findings found in documents the trial court incorporated by reference, and

those findings become the findings of the trial court. However, in *In re K.N.*, "the trial court took judicial notice of the children's underlying file," but the trial court itself made the findings of fact and conclusions of law. *Id.* at 459. The case only stands for the proposition that the trial court may take judicial notice of and incorporate reference documents, *id.*, but the trial court—not the authors of the incorporated documents—must still make the findings of fact required by N.C.G.S. § 7B-906.2.

The General Assembly identified a requirement that the trial court make the written findings of fact under both N.C.G.S. § 7B-906.2(b) and N.C.G.S. § 7B-906.2(d) and "[i]t is not the province of the courts to rewrite statutes." *State v. J.C.*, 372 N.C. 203, 208 (2019). This Court has held that "information contained in the respective reports of [department of social services] and the [guardian ad litem], however, does not satisfy the trial court's statutory obligation to fulfill the requirements of N.C.G.S. § 7B-906.2(d)[ ] by making written findings . . . ." *In re. L.R.L.B.*, 377 N.C. at 324 (concluding that information in a department of social services report or guardian ad litem report was insufficient to meet the statutory requirement for a written finding under N.C.G.S. § 7B-906.2(d)(3)). Additionally, for the required finding under N.C.G.S. § 7B-906.2(b), this Court has held that the trial court must make clear that it "considered the evidence in light of whether reunification would be clearly unsuccessful or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time." *In re J.M.*, 384 N.C. at

594 (cleaned up) (quoting *In re H.A.J.*, 377 N.C. 43, 49 (2021)).  Unless the trial court makes such findings, an appellate court cannot determine whether the trial court properly considered the evidence.

On review, an appellate court should not comb through the reference documents to identify "findings" in the record because doing so would infringe on the trial court's duty to decide "the weight and credibility of the evidence, and the inferences drawn from the evidence."  *In re D.W.P.*, 373 N.C. 327, 330 (2020).  The "trial court must, through processes of logical reasoning, based on the evidentiary facts before it, find the ultimate facts essential to support the conclusions of law."  *Id.* at 330–31 (cleaned up).  "The resulting findings of fact must be sufficiently specific to allow an appellate court to review the decision and test the correctness of the judgment."  *Id.* at 331 (cleaned up).

Thus, I would remand this case to the trial court for the trial court to make findings of fact as to each of the required factors in N.C.G.S. § 7B-906.2(d) rather than assuming that some parts of the incorporated documents constitute the trial court's findings.

### 3.  *Subsections  7B-906.2(b) & 7B-906.2(d) Require Separate Findings*

Third, the majority merges the requirement for findings under N.C.G.S. § 7B-906.2(d)(4) regarding Liam's mother's success or failure toward reunification with the ultimate finding that "reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health and safety" under N.C.G.S.

§ 7B-906.2(b). These are different findings and should not be combined into a single analysis.

The requirements of N.C.G.S. § 7B-906.2(d) direct the trial court to consider "the degree of success or failure" the parent is making toward reunification. N.C.G.S. § 7B-906.2(d). Specifically, N.C.G.S. § 7B-906.2(d)(4) requires a written finding as to "[w]hether the parent is acting in a manner inconsistent with the health or safety of the juvenile." *Id.* § 7B-906.2(d)(4). The language here evidences an intent to consider how the parent is currently acting toward the child. In contrast, N.C.G.S. § 7B-906.2(b) requires an ultimate conclusion as to whether "reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health and safety" before ceasing all effort for reunification. *Id.* § 7B-906.2(b). Subsection 7B-906.2(b) asks the trial court to consider the growth and development of the parent toward healthy future interactions with the child.

In concluding that the findings of fact in the order were sufficient under both subsections, the majority primarily relied upon the past incidents that originally led to Liam being taken into custody by the Onslow County Department of Social Services. However, the trial court order gave little consideration to findings about the current interactions between Liam and his mother. That is not to say that the trial court might not, in compliance with the statute, arrive at the same conclusion; however, in my view, the trial court fell short of establishing that further efforts at reunification would clearly be unsuccessful or inconsistent with the health and safety

of the child. I would remand this case to the trial court to make the findings of fact required by our statutes.

Finally, the majority concluded that the mother's failure to offer an explanation for the child's injury alone is sufficient to meet the requirement for findings to cease reunification with the parents under N.C.G.S. § 7B-906.2(b). While I understand that our most recent precedent holds that a parent's "persistent unwillingness to acknowledge responsibility for [a child's] life-threatening injuries would render further efforts at reunification clearly unsuccessful and inconsistent with the juvenile's health or safety" and may satisfy the requirement of subsection 7B-906.2(b), *In re J.M.*, 384 N.C. at 602 (cleaned-up), I also recognize that situations exist in which a parent did not injure their child and does not have the information to provide an honest explanation for the injuries, *see, id.* at 613 (Earls, J., dissenting) (recognizing the problem of creating a situation where, in cases in which the parent actually does not know who injured the child, "[t]here is nothing the parent can do to overcome his or her ignorance about the cause of [the child's] injuries unless the parent chooses to dishonestly blame the other").

While I agree that the mother's failure to take responsibility for Liam's injuries is a relevant consideration, I must emphasize a few additional important considerations. There is a real tension in requiring a parent facing a criminal charge to forfeit their right against self-incrimination and then also stating as the majority does, as a matter of law, that failure to claim responsibility for abuse is sufficient to

sever a parent-child relationship permanently. Second, blanket rules about one specific issue are counterproductive in complex family law cases. In this case, the trial court found that "[t]he parents were and are unable to provide any plausible explanation as to the cause of the injuries." While this finding does say that the mother has not taken responsibility for Liam's life-altering injuries, the order does not establish that the mother continues to act in a manner inconsistent with Liam's health and safety. For example, it is unclear if the trial court considered, and the majority does not discuss, whether the mother's compliance with her Georgia case plan and her success in regaining custody of Liam's brother demonstrates that she is currently acting in a manner consistent with Liam's health and safety. Such developments should be reflected in the trial court's assessments. These cases are much too complex for simplistic one-size-fits-all conclusions, and the majority contributes to that misfit. *See id*. at 615 (Earls, J., dissenting) ("Contrary to the majority's conclusion that *In re D.W.P.* requires this Court to affirm the trial court's elimination of reunification from the permanency plan here, *In re D.W.P.* suggests that a holistic review of respondent-parents' subsequent conduct was required, rather than treating their lack of knowledge about the cause of [the child's] injuries as determinative. Specifically, the parents' relationship with their children, their compliance with their case plans, and their demonstrated behavioral growth as a result of engaging with their case plan requirements are all relevant considerations

in assessing whether reunification is appropriately included in their children's permanency plans.").

In sum, I would remand this case for independent findings for each of the factors identified in N.C.G.S. § 7B-906.2(d) and for an ultimate finding that continued reunification efforts would be clearly inconsistent with Liam's health or safety as required by N.C.G.S. § 7B-906.2(b).

**C. Required Findings Under N.C.G.S. § 7B-906.1(e).**

I concur with the majority's conclusion that a trial court is only required to make written findings about the factors in N.C.G.S. § 7B-906.1(e) that are relevant. Even still, if the factor is relevant, the trial court must make the finding. Appellate courts may, of course, make inferences from the findings in the order that is appealed but should not engage in a fact-finding journey into other orders that were not appealed or reports considered by the trial court in an effort to make findings on behalf of the trial court. *See In re L.R.L.B.*, 377 N.C. at 323–24 (remanding for additional findings when the trial court's findings do not address the statute's concerns even though information in the record may address the concern). It is not the role of the appellate court to infer the findings from orders that were not appealed or reports that the trial court considered.

## II. Conclusion

In sum, I would hold that a trial court must make findings of fact to demonstrate that it first considered whether a willing and able relative placement

was contrary to the best interests of the child before the trial court considers a foster care placement. Additionally, I would follow the plain language of N.C.G.S. § 7B-906.2(d) and hold that the trial court must make written findings as to each factor identified in N.C.G.S. § 7B-906.2(d). I would also hold that when a trial court decides to cease reunification efforts with a parent, the trial court must make an independent finding demonstrating that the court considered whether further efforts at reunification would clearly be unsuccessful or inconsistent with the juvenile's health or safety as required by N.C.G.S. § 7B-906.2(b). For these reasons, I respectfully concur in part and dissent in part.

Justice EARLS joins in this concurring in part and dissenting in part opinion.